UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DONALD MARKLE III,

                          Plaintiff,

                                                          1:22-CV-0826
v.                                                        (GTS/DJS)

ULSTER COUNTY RESOURCE RECOVERY
AGENCY; and CHARLES WHITTAKER,
sued in his individual capacity,

                          Defendants.
_____

APPEARANCES:                              OF COUNSEL:

WATKINS LAW                               CHRISTOPHER D. WATKINS, ESQ.
    Counsel for Plaintiff
5 Paradies Lane
New Paltz, NY 12561

BERGSTIEN & ULLRICH, LLP                  STEPHEN BERGSTEIN, ESQ.
    Co-counsel for Plaintiff
5 Paradies Lane
New Paltz, NY 12561

ROEMER WALLENS GOLD & MINEAUX             EARL T. REDDING, ESQ.
    Counsel for Defendants
13 Columbia Circle
Albany, NY 12203

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this civil rights action filed by Donald Markle III

("Plaintiff") against Ulster County Resource Recovery Agency ("UCRRA") and Charles

Whittaker ("Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ.

P. 56.  (Dkt. No. 24.)  For the reasons set forth below, Defendants' motion is granted in part

and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Complaint

Generally, in his Complaint, Plaintiff asserts one claim, alleging that Defendants violated his rights under the First Amendment of the United States Constitution and 42 U.S.C. § 1983 by retaliating against him for engaging in protected speech activity at a meeting of the Ulster County Legislature's Energy and Environmental Committee held on May 3, 2021.   (Dkt. No. 1.)

### B.    Undisputed Material Facts on Defendants' Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The

Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendants, and either expressly admitted or denied without a supporting record citation by Plaintiff.   (*Compare* Dkt. No. 24, Attach. 1 *with* Dkt. No. 29, Attach. 1.)

1.    Plaintiff worked at UCRRA part-time from August 2012 to January 2021.

2.    Plaintiff resigned in January 2021 to start his dumpster business.

3.    Plaintiff owned and operated a sole proprietor business called Better Than Affordable Dumpster and Delivery.

4.    Plaintiff no longer ran that business as of July 2021.

5.    The business was trash removal and material handling.

6.    Plaintiff had never operated this type of business before.

7.    Plaintiff began the business because he saw a market for it through the volume of clientele.

8.    Plaintiff saw "probably dozens" of individuals making money from this type of business.

9.    Plaintiff owned two trailers that he would drop off at a customer's residence, which they would then fill with garbage, and he would bring the trailer to UCRRA to dump for a fee.

10.    Plaintiff would bring his trailers to UCRRA's Kingston and New Paltz transfer stations.

11.    Plaintiff's father-in-law helped him "if [Plaintiff] couldn't make the dump or

something, he would bring the trailer in," approximately once or twice per week.[1]

12.    Plaintiff was not making any money off the business because "all the money that was put in went right out the door."

13.    Plaintiff did not report any income or losses from the business.

14.    Timothy DeGraff is employed as UCRRA's Director of Finance and Administration.

15.    Mr. DeGraff began employment with UCRAA in January 2007.

16.    Mr. DeGraff was the Executive Director between July 2020 and sometime in 2021.

17.    Defendant Charles Whittaker is the Director of Operations and Compliance at UCCRA.

18.    Defendant Whittaker has been employed by UCRAA since 1994, and specifically as the Director of Operations since approximately 2019.[2]

19.    William Whittaker ("Mr. Whittaker") is employed at UCRRA as a Maintenance Mechanic, Grade 5.

20.    Mr. Whittaker began employment with UCRRA in 2000.

---

[1]    Plaintiff denies Defendants' asserted fact as stated, arguing that the cited deposition testimony does not support Defendants' characterization that his father-in-law helped him on a "regular basis."   (Dkt. No. 29, Attach. 1, at ¶ 30.)    The Court agrees that Defendants' characterization oversimplifies the actual testimony and therefore has reformulated the asserted fact to more closely accord with the cited evidence.

[2]    Plaintiff denies that Defendant Whittaker was Director of Operations since 2019, stating that the relevant deposition testimony indicates he had been in that position since 2007.   (Dkt. No. 29, Attach. 1, at ¶ 37.)    However, the relevant testimony states that Defendant Whittaker started in the position of *operations manager* in 2007, and then became Director of Operations in 2018, 2019, or 2020.   (Dkt. No. 24, Attach. 4, at 4-5.)

21.    Mr. Whittaker owns a dumpster delivery service named Affordable Dumpster and Delivery Service.

22.    He has had that business for about seven years.

23.    The business includes delivering a dumpster to a client, the client filling it with garbage, and him bringing it to UCRRA to empty.

24.    The business also includes purchasing and delivering compost.

25.    For the purposes of this case, mulch and compost are the same thing.

26.    The compost business depends on the season.

27.    The busy season is from April to May and from October to December.

28.    Plaintiff has known Mr. Whittaker for at least fifteen years.

29.    Plaintiff knew that Mr. Whittaker ran Affordable Dumpster and Delivery Service.

30.    Plaintiff and Mr. Whittaker worked together at UCRRA.

31.    Mr. Whittaker sold Plaintiff a golf cart.

32.    Plaintiff and Mr. Whittaker had been posting messages back and forth on Facebook about each other since on or about December 16, 2020.[3]

33.    Plaintiff also purchased mulch/compost from UCRRA as part of his business.

34.    Plaintiff would purchase a load of compost from UCRRA's recycling center and deliver it to customers.

35.    Plaintiff purchased mulch there about a dozen times.

36.    One of his customers was a neighbor of his father-in-law.

---

[3]    The post upon which the comments were made is dated December 14, 2020, but a handwritten notation on the relevant exhibit indicates that the comments themselves were posted on December 16, 2020.   (Dkt. No. 24, Attach. 12.)

37.    Plaintiff purchased the mulch at a price of $30 per ton.

38.    UCRRA would produce the mulch and set it aside for customers to purchase.[4]

39.    In May 2021, UCRRA was running short on compost.

40.    Aware of this shortage, Plaintiff called UCRRA to find out how much mulch he could take and was advised the limit was two tons per day.

41.    Plaintiff recorded this conversation.

42.    Plaintiff asked whether UCRRA had any compost because they had not had any the previous week.

43.    Plaintiff was told that they did not have compost.

44.    Plaintiff then told the person on the phone that he had been limited to two tons of compost the last time he was there.

45.    Plaintiff asked if he could come in a couple times per day.

46.    Plaintiff asked for ten tons of compost and was told he could not have ten tons.

47.    Plaintiff asked about a red truck he had observed at UCRRA earlier in the day that was "getting a bunch" of compost, but was told that that customer had taken only four tons.[5]

48.    The individuals on the phone at UCRRA did not know if Plaintiff was able to come multiple times per day for additional compost and referred him to Defendant Whittaker.

---

[4]    Plaintiff denies this fact in part, pointing to evidence stating that UCRRA set aside a pile of compost just for Mr. Whittaker that other customers were not allowed to access.  (Dkt. No, 29, Attach. 1, at ¶ 61.)    However, this does not contradict the asserted fact, given that Mr. Whittaker himself was also a "customer" in this sense.    Whether UCRRA made multiple piles is not part of this asserted fact.

[5]    The Court agrees with Plaintiff that the asserted fact does not reflect the content of the cited evidence, and has therefore revised that fact to accurately state what was said during the relevant phone call.

49.    Plaintiff did not call Defendant Whittaker.

50.    The UCRRA individuals never told Plaintiff he could not come to UCRRA more than once per day for compost.

51.    Plaintiff was asked for his name so he could be called back with an answer.

52.    Plaintiff stated that his name was John.

53.    Plaintiff's name is not John.

54.    Plaintiff stated at his deposition that he was not aware of the limit before he called UCRRA.[6]

55.    Plaintiff asked about the availability of compost because he knew there was a shortage in the amount of food waste UCRRA was taking in, which is required for the compost to be made.[7]

56.    Plaintiff was concerned about why he was limited to two tons.

57.    Plaintiff was previously allowed to take more than the limit.

58.    Plaintiff did not go to UCRRA to get compost after this telephone call.

59.    Plaintiff had heard from only one other hauler that there was a two-ton limit.[8]

---

[6]    Defendants further assert that this statement is not true, but nothing in the cited evidence squarely reflects that Plaintiff was aware that there was specifically a two-ton limit before he made the relevant call.   That portion of the asserted fact has therefore been omitted.

[7]    The Court has altered the above-asserted fact to better reflect the testimony upon which Defendants rely.   Specifically, the testimony substantiates that Plaintiff was aware of a food waste shortage and that he knew that could result in a shortage of compost, but it does not indicate that such fact means Plaintiff was aware of the two-ton limit specifically before he made the relevant phone call to UCRRA.

[8]    Plaintiff denies this asserted fact, but the evidence to which he cites does not contradict the asserted fact regarding *Plaintiff's knowledge*; rather, it discusses complaints made to Plaintiff's father when he was working at UCRRA, and those complaints did not involve the two-ton limit, but times when customers were told UCRRA had no compost.   (Dkt. No. 29,

60.    Plaintiff testified that he had a good relationship with both Charlie and William Whittaker while he was employed by UCRRA.

61.    Plaintiff had been to Mr. Whittaker's residence "probably a dozen times or so."

62.    Despite this relationship, Plaintiff never called Mr. Whittaker about the two-ton limit on compost.

63.    Plaintiff never mentioned Mr. Whittaker by name during his phone call to UCRRA.

64.    Plaintiff never spoke with Defendant Whittaker about the two-ton limit.

65.    Plaintiff attended the Ulster County Committee meeting by Zoom on May 3, 2021.

66.    Prior to the meeting, Plaintiff contacted legislator Laura Petit to "[f]igure out the composting issue on why, you know, we weren't allowed more than two ton of compost versus others getting more than two ton of compost."[9]

67.    Plaintiff did not know that UCRRA's director was at the Committee meeting until the next day.

68.    At the meeting, Plaintiff told the Committee that "smaller . . . haulers are only being limited to two ton while William Whittaker is being allowed as much as he wants."

69.    Plaintiff spoke with Ulster County Comptroller March Gallagher and stated "[t]he

---

Attach. 1, at ¶ 83 [citing Dkt. No. 24, Attach. 8, at 22-23].)

[9]    Defendants' asserted fact that Plaintiff contacted two legislators before the meeting, as well as their specific characterization of his expressed reason for that call, is not wholly supported by the evidence they cite.   The asserted fact has been amended to better reflect the content of the cited testimony.

same thing that I repeated already, that I'm only being allowed two ton and Willie is being allowed whatever he wants."

70.    After the meeting on May 3, 2021, Plaintiff brought garbage to UCRRA "about a dozen or two dozen times, right in that range, you know, fifteen or twenty or so."

71.    After the meeting on May 3, 2021, Plaintiff purchased mulch "maybe two times, two or three."

72.    The stated two-ton limit remained the same during those times.

73.    Plaintiff had no conversations with UCRRA employees during those times.

74.    Mr. DeGraff was not present at the meeting when Plaintiff made his comments.

75.    Plaintiff stated the following at the meeting:

> I guess my biggest concern is recovery and their compost . . . what they're doing with their compost is are [sic] monopolizing so that only one person is allowed to get it.   Now I have a small business.   You know, just a one-man crew and I have a lot of customers that want this compost, but we're not being sold the compost in a very small amount.   Meanwhile, you know, I don't want to throw too many names, but the head of operations['] brother hauls 20 tons of compost out of there per day, and I'm allowed one ton.   Now, so I don't know if it's something that you guys deal with or, or do I have to go somewhere else about this?

76.    Plaintiff was not limited to one ton.

77.    Plaintiff was allowed to purchase compost.

78.    On May 26, 2021, Mr. DeGraff was copied (along with the City of Kingston and UCRRA's attorney, Ken Gilligan, among others) on a complaint by William Whittaker about Plaintiff.

79.    In his complaint, Mr. Whittaker advised UCRRA that, on May 18 and 25, he experienced behavior by Plaintiff that he found offensive and intimidating.

9

80.    Mr. DeGraff investigated the complaint by doing interviews with witnesses and then spoke with UCRRA counsel about the matter.[10]

81.    Mr. DeGraff also reviewed video footage, which verified that Plaintiff was on the site, as well as the route that he took on the relevant day at the site.[11]

82.    Mr. DeGraff testified that he had previously received verbal complaints from Mr. Whittaker about Plaintiff's behavior towards him.

83.    Upon review, Mr. DeGraff sent an email to Plaintiff's employer, the City of Kingston.[12]

84.    UCCRA's Board approved of the decision to disallow Plaintiff from UCRRA's facility.

85.    On May 27, 2021, Plaintiff went to UCCRA and spoke with Mr. DeGraff.

86.    The doors were locked for reasons related to the COVID-19 pandemic.[13]

---

[10]    Plaintiff denies this asserted fact, arguing that a reasonable jury could conclude that the actions taken by Mr. DeGraff did not constitute an actual investigation because Mr. DeGraff did not document this purported investigation and interviewed only Charles and William Whittaker. (Dkt. No. 29, Attach. 1, at ¶ 106.)   However, Plaintiff's denial does not point to any evidence that Mr. DeGraff failed to conduct some sort of investigation; whether it was to a certain standard is not the subject of the asserted fact.   This fact is therefore deemed to be admitted.

[11]    Plaintiff denies this asserted fact, arguing essentially that a reasonable jury could reject Mr. DeGraff's testimony about reviewing video footage.   (Dkt. No. 29, Attach. 1, at ¶ 107.) However, Plaintiff cites no evidence contradicting Mr. DeGraff's statement.   The fact that a jury could ultimately find this testimony to be not credible at trial for reasons other than evidence contradicting him is insufficient to dispute this asserted fact for the purposes of the motion for summary judgment.

[12]    Plaintiff admits the asserted fact but attempts to add other context related to that email. (Dkt. No. 29, Attach. 1, at ¶ 109.)   Because Plaintiff has not disputed the fact actually asserted and this statement of facts is not the proper place for Plaintiff to add his own additional facts, the asserted fact is deemed to be admitted.

[13]    Plaintiff denies that he banged or pounded on the door of the main office.   (Dkt. No. 29,

10

87.    Plaintiff went to speak with then-Executive Director Mr. DeGraff at his office.

88.    Plaintiff went to the main office's front door, which was locked because of

COVID restrictions during the pandemic.

89.    Plaintiff called the number on the door and spoke with Mr. DeGraff.

90.    Plaintiff was told he was denied access, but someone else bringing Plaintiff's

trailer in for him would not denied access.

91.    Plaintiff agreed that he was upset.[14]

92.    Plaintiff demanded that Mr. DeGraff come outside, which Mr. DeGraff did not do

because he was nervous.[15]

93.    Plaintiff became aware that he was not allowed access to UCRRA through an

email sent from Mr. DeGraff to the City of Kingston.

94.    Plaintiff testified that he did not know what the "childish dispute" mentioned in

that email referred to, although he assumed "that it was that I had went to the legislators about

the composting with Willie Whittaker."

---

Attach. 1, at ¶ 113.)   This denial is supported by cited deposition testimony, and that portion of
the asserted fact has been omitted accordingly.

[14]    This fact is deemed to be admitted for the reasons stated in Note 12.

[15]    Plaintiff denies the asserted fact, citing to his own deposition testimony regarding the call
with Mr. DeGraff.   (Dkt. No. 29, Attach. 1, at ¶ 121.)   However, Plaintiff does not affirmatively
testify that he never demanded for Mr. DeGraff come outside, and he relayed that Mr. DeGraff
told him that "he was advised by legal counsel to deny [Plaintiff] access.   And then he went
into, you know, in today's day and age people come in and shoot the place up and, you know, he
has to look out for his employees."   (Dkt. No. 24, Attach. 2, at 82-83.)   Although this
explanation appears to apply to one of the reasons the decision was made to ban Plaintiff from
the UCRRA property, such concerns also reasonably could apply to why Mr. DeGraff did not
come out of the office to speak with Plaintiff.   Because Plaintiff has not cited any evidence to
squarely contradict the asserted fact, this fact is deemed to be admitted.

95.    When Plaintiff had resigned from employment at UCRRA in January 2021, he told Defendant Whittaker that his brother–Mr. Whittaker–would be his downfall.

96.    Mr. Whittaker had previously made two verbal complaints to UCRRA attorney Mr. Gilligan about the issue.

97.    Anyone other than Plaintiff was permitted to access the UCRRA facility on behalf of Better than Affordable Dump Trailers.

98.    Neither William nor Charlie Whittaker said anything to Plaintiff after the Legislative Committee meeting until the day Plaintiff received the email from Mr. DeGraff related to the ban.

99.    Plaintiff did not know if Defendant Whittaker made the decision to deny his access to the facility.

100.    Defendant Whittaker spoke with Plaintiff and advised him that he was not allowed at the UCRRA facility because of problems with Mr. Whittaker.

101.    Plaintiff would have been able to purchase compost from other sources.

102.    Plaintiff purchased approximately "a dozen loads or so" of compost from New York Crush and Recycling after May 26, 2021.

103.    Plaintiff also brought garbage to UCRRA approximately 15-to-20 times between the time of his speech at the Committee meeting on May 3, 2021, and UCRRA's determination to ban him on May 26, 2021.

104.    Plaintiff stated that he was not personally harassed or bullied, other than to the extent he considered his ban from UCRRA and surrounding events to be harassment.[16]

---

[16]    The Court agrees with Plaintiff that the cited deposition testimony contains more nuance than the interpretation Defendants have given it in the relevant asserted facts.   (Dkt. No. 24,

105.    Plaintiff continued to post on Facebook about UCRRA after the ban.

106.    On June 19, 2021, Plaintiff posted on Facebook asking the public to "[p]lease share and spread the word this bullying behavior brought on by a county facility."

### C.    Parties' Arguments on Defendants' Motion for Summary Judgment

#### 1.    Defendants' Memorandum of Law

Generally, in their motion for summary judgment, Defendants make four arguments. (Dkt. No. 24, Attach. 22.)   First, Defendants argue that Plaintiff cannot establish that his speech was chilled, which is an essential component of his First Amendment claim, because (a) he was speaking as a private citizen when he made the relevant statements, and (b) he has not pointed to any way in which he was prevented from continuing to engage in his chosen speech or prevented from obtaining mulch or disposing of garbage.   (*Id.* at 8-12.)

Second, Defendants argue that Plaintiff is unable to establish that their actions were motivated or caused by his speech because the evidence shows that Plaintiff was not banned from UCRRA's facility until it received a harassment complaint from one of its employees about Plaintiff making an offensive gesture while on the UCRRA site.   (*Id.* at 12-13.)

Third, Defendants argue that Defendant Whittaker is not personally liable because he did not make the decision to ban Plaintiff from UCRRA property and was not personally involved in that decision, but merely informed Plaintiff of that decision.   (*Id.* at 13-14.)

Fourth, Defendants argue that, based on the current record, Defendant Whittaker is protected from liability as a matter of law by the doctrine of qualified immunity.   (*Id.* at 14-15.)

---

Attach. 1, at ¶¶ 139-140; Dkt. No. 24, Attach. 3, at 91-92; Dkt. No. 29, Attach. 1, at ¶¶ 139-140.) The Court has therefore altered the asserted facts to more accurately represent Plaintiff's cited testimony, which is the only source of evidence on which Defendants rely in support.

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff makes three arguments.   (Dkt.
No. 29.)   First, Plaintiff argues that he suffered an adverse action.   (*Id.* at 16-18.)   More
specifically, Plaintiff argues that chilled speech is not a requirement to state a *prima facie* case of
retaliation pursuant to the First Amendment, but rather that other non-speech related harms can
suffice, and he has suffered such harms in the form of being banned from the UCRRA facility,
which led to the loss of his business and denial of a promotion that required access to the
UCRRA facility.   (*Id.*)

Second, Plaintiff argues that a reasonable jury could find that there was a causal
connection between his speech and his ban at the UCRRA facility.   (*Id.* at 18-26.)   More
specifically, Plaintiff argues that (a) the ban occurred approximately three weeks after his
speech, and (b) statements made by Defendant Whittaker, the audit conducted of UCRRA's
composting operations, and subsequent negative media coverage constitute direct evidence of a
causal connection, and a reasonable jury could conclude that Defendants' stated reason for
banning Plaintiff was a pretext for retaliation.   (*Id.*)

Third, Plaintiff argues that Defendant Whittaker can be held individually liable and is not
entitled to qualified immunity.   (*Id.* at 26-28.)   More specifically, a jury could conclude that
Defendant Whittaker was personally involved based on his own statements and actions even if he
was not the person whose name is attributed to the final decision, and the same questions of fact
regarding personal involvement preclude the application of qualified immunity at this stage.
(*Id.*)

### 3.    Defendants' Reply Memorandum of Law

14

Generally, in reply to Plaintiff's arguments, Defendants make two arguments.    (Dkt. No. 33.)   First, Defendants argue that Plaintiff is unable to establish a concrete harm because, even if he has alleged that harms other than chilled speech might suffice, the evidence does not support a rational finding that such harms actually occurred and in fact substantiates a finding that he continued to run his business and use the UCRRA facility after he engaged in the alleged speech, that he shut his business simply because it was not profitable, and that he was not denied a promotion with the City of Kingston but rather left for a better job with Ulster County.   (*Id.* at 8-9.)

Second, Defendants argue that Plaintiff is unable to establish that his ban from the UCRRA facility was motivated or substantially caused by his speech as opposed to by his long-running personal feud with William Whittaker and his own behavior.   (*Id.* at 10-11.)

## II.    LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[17]   As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."   *Anderson*, 477 U.S. at 248.

---

[17]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ.

P. 56(a), (c), (e).[18]

        Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.

        Of course, when a non-movant willfully fails to respond to a motion for summary

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that

the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Rather, as indicated above, the Court must assure itself that, based on the undisputed material

facts, the law indeed warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v.

Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is

lighten the movant's burden.

---

[18]        Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to
the movant's Statement of Material Facts, which admits or denies each of the movant's factual
assertions in matching number paragraphs, and supports any denials with a specific citation to
the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[19]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[20]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[19]    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[20]    *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

### III.     ANALYSIS

### 1.     Whether Summary Judgment Is Warranted on Plaintiff's First Amendment Claim

After careful consideration, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memorandum of law.   *See, supra* Part I.C.2. of this Decision and Order.   To those reasons, the Court adds the following analysis.

 "To establish First Amendment retaliation by a government actor, the plaintiff must demonstrate that '(1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech.'"   *Agosto v. New York City Dep't of Edu.*, 982 F.3d 86, 94 (2d Cir. 2020) (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 394 [2d Cir. 2018]).   These requirements have alternatively been stated as "(1) that [the plaintiff] had an interest protected by [the First] Amendment; (2) the 'defendants' actions were motivated or substantially caused by his exercise of that right,'; and (3) defendants' actions effectively chilled [the plaintiff's] exercising his rights."   *Thomas v. Town of Lloyd*, 2022 WL 1747650, at *7 (N.D.N.Y. May 31, 2022) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 [2d Cir. 2008]).   Regardless of how the elements of this cause of action are stated, both formulations require essentially the same findings, as will be discussed below.

First, the speech or conduct engaged in by the plaintiff must be protected by the First Amendment.   There appears to be no dispute between the parties that Plaintiff's statements at the Committee meeting constitute speech protected by the First Amendment.

Second, the defendant must have taken an adverse action against the plaintiff.   An adverse action is one "'that would deter a similarly situated individual of ordinary firmness from

18

exercising his or her constitutional rights.'" *A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d

246, 269 (N.D.N.Y. 2022) (Sannes, J.) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654

F.3d 267, 273 [2d Cir. 2011]).   In the First Amendment context, the Second Circuit has recently

suggested that an adverse action requires that the plaintiff show that his or her First Amendment

rights were "actually chilled," *or* that the circumstances fall into one of the contexts in which

another form of harm can be "accepted in place of the 'actual chilling' requirement." *Searle v.*

*Red Creek Cent. Sch. Dist.*, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) (quoting *Zherka v.*

*Amicone*, 634 F.3d 642, 645 [2d Cir. 2011]); *see also Dorsett v. Cnty. of Nassau*, 732 F.3d 157,

160 (2d Cir. 2013) ("Chilled speech is not the *sine qua non* of a First Amendment claim.   A

plaintiff has standing if he can show *either* that his speech has been adversely affected by the

government retaliation or that he has suffered some other concrete harm.   Various non-speech

related harms are sufficient to give a plaintiff standing.") (emphasis in original).   These other

harms must be sufficiently tangible and concrete to serve as a substitute for actual chilling of

speech.  *Zherka*, 634 F.3d at 645-46.

Although the arguments and evidence presented do not suggest that Plaintiff experienced

any actual chilling of his speech (given that he continued to post on Facebook, for example,

about the issues related to UCRRA and the allocation of compost), the fact of his being banned

from the UCRRA facility represents the type of tangible harm that the Second Circuit has

recognized as being sufficient to substitute for such actual chilling.   *See Zherka*, 634 F.3d at 646

(contrasting responsive defamatory statements [which were found to not be sufficiently tangible]

with examples such as "denial of a permit or threat of a lost contract").   Here, Plaintiff has

presented admissible record evidence that he was banned from accessing the UCRRA facility,

which had tangible implications for how he conducted (and whether he was able to feasibly continue to conduct) his business (including in the form of higher prices to obtain compost from another facility and needing to rely on another person to drive his truck if he wanted to have garbage dumped at or compost purchased from the UCRRA facility) as well as his other employment, as he could no longer drive trucks to UCRRA in the capacity of his work duties for his job with the City of Kingston. (*See generally* Dkt. No. 24, Attach. 3.) The fact that Plaintiff may not have been completely prevented from utilizing the UCRRA facility in connection with his business (to the extent that he could have had someone else bring garbage to dump or pick up compost in his company trucks, so long as Plaintiff was not himself there) does not mean that the ban cannot constitute an adverse action. Plaintiff specifically testified that he ceased operating his business in July 2021 because "trying to make money off it and still pay somebody to do the trailers just wasn't feasible[;] my father-in-law can't do it every day." (Dkt. No. 24, Attach. 3, at 87.) In light of the evidence that Plaintiff ran the business by himself other than receiving some help from his father-in-law (who, as far as the evidence establishes, was not his employee), a reasonable factfinder could conclude that the ban from the facility had a significant impact on his ability to continue his business and thus constituted a sufficiently tangible adverse action.[21]

---

[21]    Further, the Court is not persuaded, for the purposes of this motion, by Defendants' arguments that Plaintiff would have likely closed his business without Defendants' conduct because Plaintiff admitted that he did not make any money from that business. This argument involves a factual issue that would be more appropriately resolved by a jury. The Court notes also that, in deposition testimony, Mr. Whittaker testified that his hauling business (which is similar to Plaintiff's) resulted in a total net profit of only $1,500 the previous year, and he acknowledged that there is "[n]ot really a whole lot of money there to be made." (Dkt. No. 24, Attach. 5, at 8, pp. 22-24.) Thus, the fact that Plaintiff's business (which had been open for only approximately six months at the time of the ban, during which time Plaintiff had needed to purchase equipment and supplies) was not at the time making any money does not inherently

Third, there must be a causal connection between Plaintiff's statements at the Committee meeting and the choice to ban him from the UCRRA facility. As Plaintiff notes, his speech occurred on May 3, 2021, and he was banned from the facility on May 26, 2021. A period of a few weeks is well within the time frame that courts within the Second Circuit have found to be sufficient to show causation for the purposes of establishing a *prima facie* case. *Wheeler v. Bank of New York Mellon*, 256 F. Supp. 3d 205, 221 (N.D.N.Y. 2017) (Kahn, J.) (citing *Nagle v. Marron*, 663 F.3d 100, 111 [2d Cir. 2011]). Additionally, although Defendants argue that any inferable causal connection created by the timeline of events has been broken by Plaintiff's reported conduct towards Mr. Whittaker,[22] there is a genuine dispute of material fact regarding whether Plaintiff actually engaged in such conduct.

Because the action taken against Plaintiff could constitute a sufficient adverse action to support his claim, and because genuine issues of material fact exist that remain to be resolved related to Plaintiff's First Amendment claim, summary judgment is not appropriate.

### 2. Whether Defendant Whittaker Was Personally Involved in the Alleged Constitutional Violation

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memorandum of law-in chief. *See supra,* Part I.C.1. To those reasons, the court adds the following analysis.

---

lead to the conclusion that he would have closed his business even if he had not been banned from UCRRA.

[22] Of note, the alleged incident in which (according to Defendants' version of the facts, which has been properly disputed) Plaintiff was banging on the doors and scaring UCRRA employees in the office occurred *after* the decision to ban Plaintiff from the facility occurred; and thus any such conduct, even if credited by a factfinder, could not have formed any part of the Defendants' reasons for initiating the ban in the first place.

"'Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Goodall v. New York State Dep't of Corrs. and Cmty. Supervision*, 725 F. Supp. 3d 248, 268 (N.D.N.Y. 2024) (quoting *Wright v. Smith*, 21 F.3d 496, 501 [2d Cir. 1994]). "'A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered.'" *Garcia v. McIntosh*, 21-CV-0135, 2024 WL 1469414, at *10 (N.D.N.Y. Feb. 12, 2024) (Dancks, M.J.), report-recommendation adopted by 2024 WL 939225 (N.D.N.Y. Mar. 5, 2024) (Hurd, J.) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]). To be considered personally involved, "a party may have directly participated in the alleged constitutional deprivation," or, in the case of supervisory personnel, "failed to remedy a wrong after learning of the violation." *M.R. v. Rispole*, 22-CV-0756, 2024 WL 1655383, at *8 (N.D.N.Y. Apr. 17, 2024) (Kahn, J.) (quoting *Schallop v. New York Stated Dep't of Labor*, 20 F. Supp. 2d 384, 392 [N.D.N.Y. 1998] [Homer, M.J.]); *see also Fowlkes v. Parker*, 08-CV-1198, 2010 WL 5490739, at *9 (N.D.N.Y. Dec. 9, 2010) (Peebles, M.J.), report-recommendation adopted by 2011 WL 13726 (N.D.N.Y. Jan. 4, 2011) (Kahn, J.) (finding lack of personal involvement where, although the defendant agency had input into the decision regarding the plaintiff's ultimate sex offender level designation, it did not make the final determination).

Plaintiff argues that a reasonable factfinder could conclude that Defendant Whittaker was personally involved in the decision to ban him from the UCRRA facility because (a) one week after Plaintiff engaged in protected speech, Defendant Whittaker told Plaintiff's father (an UCRRA employee) that Plaintiff would not be allowed on the property if he continued to "create issues," (b) an UCRRA employee told Plaintiff that Defendant Whittaker had informed them that

Plaintiff would no longer be able to use UCRRA facilities, and (c) before Defendant Whittaker informed Plaintiff that he was not permitted to enter the UCRRA facility, he told Plaintiff's father that "now it's f'ing personal, I'm going to throw your son out."   (Dkt. No. 29, at 27-28.)

As to the second and third of these arguments, there is no indication that the statements made to either the UCRRA employee or Plaintiff's father occurred before the decision was already made to ban Plaintiff.   Plaintiff's father's deposition testimony indicates that the relevant conversation occurred just before Defendant Whittaker informed Plaintiff of the ban, which, according to the undisputed evidence, occurred on May 27, 2021.   (Dkt. No. 24, Attach. 8, at 34-35.)   Plaintiff's own declaration indicates that the phone conversation with the UCRRA employee took place "on or about" May 26, 2021.   (Dkt. No. 29, Attach. 14, at ¶ 3.)   Mr. DeGraff testified at his deposition that he made the decision to ban Plaintiff on May 26, 2021. (Dkt. No. 24, Attach. 6, at 11, pp. 34-35.)   Although Mr. DeGraff also testified that the Board approved and ratified his decision, it is not clear whether that occurred on the same date.   (*Id.* at 11, p. 35; *see also* Dkt. No. 24, Attach. 7, at 7 pp. 18-19, 8 p. 25 [in which Ms. Beinkafner testifies that she, as chair of the Board at the time, approved the decision to ban Plaintiff from UCRRA, stating that "[t]he original decision was made by Tim DeGraff, and then we discussed it at the board and then we approved it"].)   Because these alleged statements by Defendant Whittaker were made *after* the decision to ban Plaintiff had already been made, they do not suggest that Defendant Whittaker was the one who made that decision.   Moreover, the fact that Defendant Whittaker may have been the one who informed employees that Plaintiff was banned does not, without more, even inferentially suggest that he was the one who made the decision to ban Plaintiff.   The full context of the testimony by Plaintiff's father indicates that Defendant

Whittaker stated he was going to throw Plaintiff out after Plaintiff had already heard about the decision to ban him and had come to UCRRA to talk about it with Mr. DeGraff.   (Dkt. No. 24, Attach. 8, at 34-35.)   As a result, Defendant Whittaker was acting pursuant to Mr. DeGraff's decision (which had been approved by the Board) when making Plaintiff leave the facility. Again, the fact that Defendant Whittaker was enforcing the ban (and perhaps even enjoying that task) does not lead to a reasonable inference that he was the one who made the decision to implement the ban.

As to the first of the statements (i.e., that Defendant Whittaker told Plaintiff's father that, "if my son continued to 'create any more issues,' then he would no longer be allowed on the property"), such a statement does not lead to a reasonable inference that Defendant Whittaker was involved in the decision to ban Plaintiff from the UCRRA property.   (Dkt. No. 29, Attach. 18, at ¶ 3.)   Plaintiff himself has admitted that he does not actually know whether Defendant Whittaker made the decision to ban him from the facility, merely that he believes that is the case because "Charles Whittaker runs the operation."   (Dkt. No. 24, Attach. 3, at 80.)   However, Plaintiff also admitted being aware both that UCRRA is led by a Board of Directors and that Mr. DeGraff was the head of UCRRA at the relevant time.   (*Id.* at 81.)   Further, Plaintiff testified at his deposition that Mr. DeGraff told him during their discussion on the day he was banned that Mr. DeGraff was "advised by legal counsel to deny [Plaintiff] access."   (*Id.* at 82.)   There has been no admissible record evidence presented that Defendant Whittaker, as Director of Operations and Compliance, had the authority to ban Plaintiff from the facility.   Moreover, to the extent that the undisputed evidence shows that it was Mr. DeGraff and the Board who made the formal decision to ban Plaintiff (given that Plaintiff's speculative belief to the contrary is

insufficient to dispute the evidence presented by Defendants), there is no admissible record evidence that Defendant Whittaker was in any way personally involved in that decision or even advised or influenced Mr. DeGraff in that decision.   That Defendant Whittaker may have made a statement that Plaintiff could be banned if he continued to "create any more issues" could not permit a reasonable factfinder to conclude that Defendant Whittaker was personally involved in the relevant decision under the circumstances.

Because there is no admissible record evidence from which a reasonable factfinder could conclude that Defendant Whittaker was personally involved in the decision to ban Plaintiff from the UCRRA facility, Plaintiff cannot sustain his Section 1983 claim against Defendant Whittaker.   *See Gandhi v. New York State Unified Court Sys.*, 20-CV-0120, 2024 WL 365119, at *7 (N.D.N.Y. Jan. 31, 2024) (Kahn, J.) (finding defendant was not personally involved where there was no evidence to show they made the decision to either terminate the plaintiff or to not hold his termination in abeyance).

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 24) is **GRANTED** **in part** and **DENIED** **in part**; and it is further

**ORDERED** that Plaintiff's First Amendment claim against Defendant Whittaker is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's First Amendment claim against Defendant UCRRA **SURVIVES** Defendants' motion.

Dated:  December 30, 2024
        Syracuse, New York


Glenn T. Suddaby
U.S. District Judge